**Naomi FELIX and Irene Cooper as Administrators of the Estate of Denise Felix, Plaintiffs,**

v.

**NEW YORK CITY TRANSIT AUTHORITY, Defendant.**

No. 98 CIV. 5687(SAS).

United States District Court, S.D. New York.

July 16, 2001.

former employer, the New York City Transit Authority ("NYCTA"), discriminated against her in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* In particular, Felix alleged that the NYCTA unlawfully terminated her employment and failed to reasonably accommodate her disability. On July 15, 1999, the Civil Rights Clinic of Washington Square Legal Services, Inc. appeared on her behalf.

On July 28, 2000, the NYCTA moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). However, because Denise Felix died on July 27, 2000, the motion was withdrawn and the case was placed on suspense. Letters of administration were issued appointing Naomi Felix and Irene Cooper administrators of the estate of Denise Felix. A Suggestion of Death was filed by Irene Cooper, Felix's mother, on March 16, 2001. On April 9, 2001, the case was restored to the active docket and the caption was changed to reflect the administrators as plaintiffs. The NYCTA re-filed its motion for summary judgment on May 1, 2001 seeking to dismiss the Complaint in its entirety. For reasons that follow, the NYCTA's motion is granted.

Laura Sager, Esq., Washington Square Legal Services, Inc., New York City, for Plaintiffs.

Richard Schoolman, Esq., Paulette Thompson, Esq., Office of the General Counsel, New York City Transit Authority, Brooklyn, NY, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Denise Felix filed a pro se Complaint dated August 11, 1998, alleging that her

## I. BACKGROUND

### A. Felix's Employment with the NYCTA

Felix was hired by the NYCTA in 1994 as a Railroad Clerk in its Department of Stations ("Stations Department"). *See* 7/28/00 Declaration of Paulette Thompson ("Thompson Decl."), defendant's attorney, ¶ 2. Railroad Clerks work in token booths, located in the subways, where they sell tokens, commuter passes and fare cards as well as provide information to passengers. *See id.* ¶ 9. In 1996, the Stations Depart-

ment employed approximately 3,417 Railroad Clerks. Although Railroad Clerks work primarily in underground subway booths, approximately 50 Railroad Clerks work in above-ground offices of the Stations Department. *See id.* Felix worked as an "extra" Railroad Clerk, relieving other Railroad Clerks who were away from their positions. *See id.* ¶ 3.

## B. The Firebombing Incident

On November 26, 1995, while Felix was in a subway on her way to relieve a Railroad Clerk at the Kingston and Throop subway station, she was informed of a firebombing incident at that station. *See id.* The token booth on the southbound platform had been firebombed and the Railroad Clerk inside the booth was killed. *See id.* Upon seeing the smoke-filled platform and learning what happened, Felix became so distraught that she had to be taken to the emergency room at Kings County Hospital. She was released the same day. The following day, Felix was directed to report to the NYCTA's Medical Assessment Center ("MAC") so that she could be evaluated by NYCTA physicians. *See id.*

## C. Subsequent Medical Determinations

Felix first visited the MAC on November 27, 1995. *See id.* ¶ 4. At that time it was determined that Felix was medically unable to work at all and she was given a "No Work" status. This status changed after Felix's second visit to the MAC on November 30, 1995, at which time she was given a temporary status of "Restricted Work." *See id.* If a MAC physician designates an employee as "restricted work" status, she is required to fill out a Restricted Work Assessment form indicating the nature of the restriction. *See* Deposition of Dr. Florence Mitchell ("Mitchell Dep."),

Ex. 5 to Plaintiffs' Appendix to Statement Pursuant to Rule 56.1 ("Pl.App."), at 15. The notation on the November 30, 1995 Restricted Work Assessment form indicated that Felix was not to work alone in a booth and was not to work at the Kingston and Throop token booth. *See* 11/30/95 Restricted Work Assessment, Ex. O to Thompson Decl., at 2b. Given these restrictions and the work it had available for Railroad Clerks, the Stations Department gave Felix a "No Work Available" status. *See* Thompson Decl. ¶ 4.

From December 7, 1995 through June 28, 1996, Felix visited the MAC nine times. *See id.* Medically, Felix remained on "Restricted Work, temporary" status with the repeated notation that Felix could do no subway work but could do clerical work if available. *See, e.g.,* 1/11/96 and 6/28/96 Restricted Work Assessments, Ex. O to Thompson Decl., at 5a, 12a. Felix was given "No Work Available" status by the Stations Department which claimed there was no restricted work available for Railroad Clerks that was not located in the subway. *See* Thompson Decl. ¶ 4. Felix remained medically on "Restricted Work, temporary" status and departmentally on "No Work Available" status for approximately nine months. *See id.*

Then, on August 15, 1996, Felix returned to the MAC and was given "No Work, temporary" status by Dr. Mitchell who previously assessed Felix on December 29, 1995 and January 11, 1996. *See* 12/29/95 and 1/11/96 Progress Reports, Ex. O to Thompson Decl, at 4, 5. A medical "No Work" status means that the NYCTA cannot assign that particular employee *any* work within the transit system. *See* Thompson Decl. ¶ 4. In her August 15, 1996 Progress Report, Dr. Mitchell stated: "I do not believe Ms. Felix can perform any work at present." *See* 8/16/96 Progress Report, Ex. O to Thompson Decl., at

13. Dr. Mitchell reached the same conclusion on October 18, 1996 (not ready to return to work) and November 22, 1996 ("probably still unable to perform any useful work at present"). *See* 10/18/96 and 11/22/96 Progress Reports, Ex. O to Thompson Decl., at 14, 15. Dr. Mitchell observed that Felix was unable to perform the activities of daily life because of depression and psychomotor retardation. *See* Mitchell Dep. at 58.

During this period, the five NYCTA physicians who examined Felix prepared Progress Reports detailing their assessment of her condition after each visit. In the subjective section of these reports, the physicians noted Felix's sleep disturbance. For example, the December 7, 1995 Report indicates that Felix had a disturbance of sleep and eating. *See* 12/27/95 Progress Report, Ex. O to Thompson Decl., at 3. Reports from January 11, 1996 through April 6, 1996 consistently note that Felix had nightmares and could not sleep. *See* 1/11/96, 2/2/96, 3/1/96, 3/29/96 and 4/26/96 Progress Reports, Ex. O to Thompson Decl., at 5, 6, 7, 8, and 9. Earlier reports do not specifically mention nightmares but do note Felix's sleep disturbances. *See* 11/27/95, 11/30/95 and 12/7/95 Progress Reports, Ex. O to Thompson Decl., at 1, 2 and 3. Apparently, Felix's sleep problem progressively worsened as evidenced from later reports. The May 10, 1996 Report indicates that Felix still had insomnia and "can't sleep at all since beginning Diazepam." *See* 5/10/96 Progress Report, Ex. O to Thompson Decl., at 10. Furthermore, the May 31, 1996 Report indicates that Felix was getting four hours of sleep per night. *See* 5/31/96 Progress Report, Ex. O to Thompson Decl., at 11. Finally, the subjective portion of the June 28, 1996 Report states that Felix hadn't slept for two weeks while the objective portion of that report indicates that Felix was only sleeping one to two hours per night. *See*

6/28/96 Progress Report, Ex. O to Thompson Decl., at 12.

On December 5, 1995, Felix began seeing a psychiatrist, Dr. Kenneth Schwartz. *See* 12/5/95 Neuropsychiatric Narrative Report, Ex. C to 7/27/00 Declaration of Richard Schoolman, defendant's attorney ("Schoolman Decl."), at 1. Dr. Schwartz diagnosed Felix as having an adjustment disorder with major depression which was causally related to the firebombing incident. *See id.* at 2. Dr. Schwartz further opined that Felix "has a total disability" and "cannot work or function socially." *See id.* at 3.

Dr. Schwartz's initial diagnosis of complete incapacitation changed shortly thereafter. During the period from March 27, 1996 through November 19, 1996, Dr. Schwartz diagnosed Felix as having an adjustment disorder. *See* Information Relating to Employee Illness or Accident Forms, Ex. 27 to Pl.App., *passim.* The date Felix became unable to work was consistently marked "11/26/95" but the only limitation on Felix's ability to do light work was always "no subway work." *See id.* Dr. Schwartz repeatedly noted that Felix could not perform full work but that she could do light work outside the subway. *See id.*

**D. Termination**

Felix was terminated on November 26, 1996, pursuant to Civil Service Law § 71, which authorizes the NYCTA to terminate a civil service employee who, for medical reasons, is unable to return to work after a year's absence. *See* Thompson Decl. ¶ 5. Felix was informed of the possibility of termination in letters dated February 21 and September 26, 1996. *See* 2/21/96 and 9/26/96 Letters to Denise Felix from Charles E. Glasgow, Director of Human Resources, Ex. P to Thompson Decl. In

the February letter, the NYCTA stated that it was considering Felix's case for "restricted duty assignment, reclassification, retirement or termination." *Id.* The September letter stated that Felix had been unable to perform the full duties of her position for a period of ten months. *See id.* In the same letter, the NYCTA then informed Felix of its intention to terminate her employment effective November 26, 1996. *See id.* Neither letter provided any information about the right to challenge a medical "No Work" determination.[1] *See* Plaintiffs' Statement Pursuant to Fed.R.Civ.P. 56.1 ("Pl.56.1") ¶ 6 at 18.[2] Felix was terminated by a letter dated November 26, 1996 for having failed to perform the full duties of her position for a consecutive one-year period. *See* 11/26/96 Letter to Denise Felix from Charles E. Glasgow, Ex. P to Thompson Decl.

### E. Reasonable Accommodation

The NYCTA is subject to the Rules and Regulations of the New York City Department of Administrative Citywide Services ("DCAS") which implements the New York Civil Service Law. *See* Pl. 56.1 ¶ 3 at 2. NYCTA employees obtain competitive civil service positions, such as Railroad Clerk, by taking a test for that particular civil service title. *See id.* The term "reassignment" means transferring an employee to a different position in the same civil service title. *See id.* ¶ 16 at 6. The NYCTA is free to transfer an employee from one job to another in the same civil service

title. *See id.* ¶ 4 at 2. Reclassification, on the other hand, is the process by which an employee's civil service title is changed so that the employee may be transferred to a position in a different civil service title without taking the civil service exam for that title. *See id.* ¶ 16 at 6. The NYCTA must obtain the approval of DCAS before reclassifying an employee to a position in a different civil service title. *See id.* ¶ 4 at 2.

Before her termination, Felix and her mother, Irene Cooper, wrote the NYCTA requesting reasonable accommodation under the ADA. *See* 8/13/96 Letter to Charles E. Glasgow from Denise Felix and Irene Cooper, Ex. T to Thompson Decl. In response, Chief Stations Officer Carol Meltzer informed Ms. Cooper that no reasonable accommodation was available as Felix had been designated "No Work" at her previous MAC visit. *See* 8/22/96 Letter to Irene Cooper from Carol E. Meltzer, Chief Station Officer, Ex. U to Thompson Decl. Plaintiffs argue that both before and after this "No Work" determination was made, reasonable accommodation was available to Felix in the form of reassignment or reclassification.

The reassignment urged by plaintiffs would have transferred Felix from a subway Railroad Clerk to an office duty Railroad Clerk. *See* Pl. 56.1 ¶ 16 at 6. While office duty Railroad Clerks are selected based on their clerical abilities and work experience, the office positions are not considered promotions. *See id.* ¶ 14 at 5. To .

---

1. Because Felix was unaware of any particular procedure to challenge a medical "No Work" determination, she asked her union to file a grievance. *See* Deposition of Denise Felix ("Felix Dep."), Ex. 14 to Pl.App., at 81. A grievance contesting the denial of work and requesting reasonable accommodation was filed and denied. *See* Step II Decision, Ex. 32 to Pl.App., at 1. After a Step II hearing was held on October 29, 1996, appeal of the denial was dismissed. *See id* at 2.

2. Citation to both paragraph and page number is necessary as plaintiffs' Rule 56.1 Statement does not separately number each paragraph but begins again at number one after paragraph number twenty-two. Moreover, rather than provide a concise statement of the facts, several of plaintiffs' paragraphs continue for multiple pages.

notify Railroad Clerks of these office positions, the NYCTA posts memos soliciting responses from interested employees. *See id.* ¶ 15 at 6. Sometimes memos are not posted and instead the hiring manager fills vacancies by looking through a file of previously submitted resumes. *See id.*

An office duty Railroad Clerk must be fully capable of returning to work in the subways during emergencies or when operational needs require. *See* Thompson Decl. ¶ 9. Plaintiffs concede that the NYCTA occasionally requests office Railroad Clerks to work in the subways on an as-needed basis. *See* Pl. 56.1 ¶ 2b at 10. Such short-term "field assignments" are rare, usually occurring only several times per year. *See* 2/3/00 Deposition of Eller Quinn ("Quinn Dep."), an office Railroad Clerk, Ex. W to Thompson Decl., at 25 (one or two days a year); *see also* 2/3/00 Deposition of Steven G. Larrymore, a NYCTA employee, Ex. BB to Thompson Decl., at 25 (two to three times a year).

According to the NYCTA, there were no vacancies for office duty Railroad Clerks during the period from November 26, 1995 through November 26, 1996. *See* Thompson Decl. ¶ 10. Although NYCTA management changed or eliminated some office positions and reassigned personnel, it claims that these changes did not create vacancies. *See id.* Plaintiffs dispute this contention by pointing to three vacancies in office positions that occurred during this period. *See* Pl. 56.1 ¶ 2b at 11. One such vacancy arguably occurred in February 1996, when Brenda Marshall was promoted and left her position in the restricted duty unit of the Stations Department. *See id.* Marshall's position was given to Eller Quinn in March 1996, after her return

from a maternity leave taken in November 1995. *See id.* According to the NYCTA, this personnel change did not create a vacancy as Quinn was already working in an office prior to her maternity leave.[3] *See* Thompson Decl. ¶ 10. In addition, plaintiff's review of the NYCTA's Job Book Supplement revealed what appears to be two other vacancies: one in the Customer Complaints office given to Alberta Cheney on July 7, 1996; and another in the Station Command Office given to Patricia Beckford on July 21, 1996. *See* Pl. 56.1 ¶ 2b at 12. The NYCTA conceded that Beckford had an office assignment as a night typist during the second half of 1996. *See* 4/26/01 Declaration of Charles E. Glasgow, Director of NYCTA's Office of Labor Relations, ¶ 6.

The other way in which the NYCTA could have arguably made reasonable accommodation was through reclassification. The NYCTA's restricted duty policy makes reclassification possible in two limited circumstances: (1) where an employee is given a "Restricted Work, permanent" medical status; and (2) where an employee is given a "Restricted Work, temporary" medical status and has remained in that status for ten consecutive months. *See* Thompson Decl. ¶ 6. Here, Felix was not eligible for reclassification under the NYCTA's restricted duty policy—by September 26, 1996, the time Felix would have otherwise hit her ten-month mark, she had already been on "No Work" status for approximately six weeks. *See id.* Plaintiffs argue that the NYCTA's ten-month policy is more restrictive than necessary as the DCAS permits any employee to be reclassified at any time and for any reason if she is qualified for the new job and the two

---

**3.** The NYCTA does not guarantee Railroad Clerks the right to remain in office positions, nor does it give preference to Railroad Clerks who have previously held office positions

when filling office vacancies. *See* Pl. 56.1 ¶ 2a at 11. Quinn acknowledged that she was never given any assurance that her office position was permanent. *See* Quinn Dep. at 31.

positions are at the same grade level. *See* Pl. 56.1 ¶ 18 at 7. Plaintiffs also dispute the propriety of Felix's "No Work" status determination made on August 15, 1996. *See id.* ¶ 5 at 16–17.

Even if Felix had become eligible for reclassification under NYCTA policy, the NYCTA's interpretation of its restricted duty policy would have prevented reclassifying Felix given her medical restrictions. It is the NYCTA's practice to reclassify a Railroad Clerk to the titles of Transit Property Protection Agent ("TPPA") and Cleaner, if there is a vacancy in those titles. *See* Thompson Decl. ¶ 7. This practice is the result of previous rejected attempts by the NYCTA to reclassify an "operating title" such as Railroad Clerk to a "non-operating title" such as clerical associate. *See id.* The parties agree that there were no vacancies in the TPPA position and that the vacancies in the Cleaner position were unsuitable because they were located in the subways. *See* Pl. 56.1 ¶ 8 at 19. Plaintiffs point to a vacancy in the civil service title Clerical Associate 1A that became available August 23, 1996. *See* 8/23/96 Job Vacancy Notice, Ex. 33 to Pl.App. While this position would not have been available to Felix under NYCTA practice, the DCAS Director of Classification testified that DCAS would have permitted a Railroad Clerk to be reclassified to a clerical position if she was otherwise qualified. *See* Deposition of Sherry Schultz ("Schultz Dep."), DCAS Director of Classification, Ex. 4 to Pl.App., at 127–28.

**F. Social Security Benefits**

On February 28, 1997, approximately three months after Felix was terminated, she applied for Social Security Disability Insurance ("SSDI") benefits. *See* 2/28/97 Application for Disability Insurance Benefits, Ex. B to Schoolman Decl. The type-written application form, signed by Felix on March 7, 1997, included the following statement: "I became unable to work because of my disabling condition on November 26, 1995." *See id.* at 1. At her deposition, Felix testified that she had applied for SSDI benefits over the telephone. *See* Felix Dep. at 50. Felix further testified that she never told the Social Security Administration ("SSA") that she was unable to work, only that she was unable to work in the subways. *See id.* at 55. Felix believed that she was entitled to SSDI benefits even though she claimed she could do non-subway work because those benefits were "a temporary check [for][a] temporary disability." *Id.* at 56.

On June 2, 1997, the SSA denied Felix's application for SSDI benefits. *See* 6/2/97 Notice of Disapproved Claim, Ex. 20 to Pl.App. The SSA informed Felix that it had based its decision on the December 5, 1995 Report from Felix's treating physician, Dr. Schwartz, as no other reports were available. *See* 5/20/97 Explanation of Determination, Ex. 20 to Pl.App. Felix then filed a request for reconsideration, dated July 29, 1997, wherein she stated that she was disabled and unable to work and that her condition had worsened. *See* 7/29/97 Request for Reconsideration, Ex. 20 to Pl.App.

After receiving Felix's request for reconsideration, the SSA re-opened her case and obtained more medical reports describing Felix's condition. One such report was an Addendum to Psychiatric Report, dated April 25, 1997, prepared by Dr. Schwartz. *See* 4/25/97 Addendum to Psychiatric Report, Ex. D to Schoolman Decl. In his Addendum, Dr. Schwartz remarked: "The patient still is unable to work and needs further treatment." *See id.* Another report from Dr. Schwartz was a letter dated December 12, 1997, where he stated that "[t]he patient is unable to work." *See*

12/12/97 Letter from Dr. Schwartz, Ex. E to Schoolman Decl. The SSA also contacted Dr. Schwartz by telephone on March 6, 1998. *See* 3/6/98 Report of Contact, Ex. G. to Schoolman Decl. Dr. Schwartz allegedly told an SSA employee that Felix has been disabled since he had been treating her and will continue to be disabled for at least one year. *See id.*

Felix was also examined by an outside physician. On February 25, 1998, Dr. Gianelli, a consulting psychiatrist for the SSA, described Felix as suffering from "extreme psychomotor retardation." Report of Dr. Gianelli, Ex. F to Schoolman Decl., at 1. Dr. Gianelli concluded that Felix was unable to perform the activities of daily living without assistance and that she was "unable to work at this time." *Id.* at 2. On March 20, 1998, the SSA reversed its denial and deemed Felix disabled for SSDI purposes as of November 26, 1995. *See* 3/20/98 Disability Determination and Transmittal, Ex. H to Schoolman Decl. Payments were made retroactive to May 1996. *See* 7/11/00 Letter to Denise Felix from Martin Iaffet, Deputy Regional Commissioner, Ex. I to Schoolman Decl.

## II. DISCUSSION

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law[,]' [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Pru-*

*dential Ins. Co. of Am.,* 234 F.3d 92, 97 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir.2001). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific·facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505). However, the non-moving party may not "rest upon ... mere allegations or denials." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 452 (2d Cir.1999), *cert. denied,* 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000); *see also Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) ("If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal quotation marks and citation omitted) (alteration in original).

### B. Preclusion

■ The NYCTA argues that Felix's ADA claim should be precluded because she applied for and received SSDI benefits. The Supreme Court, however, has held that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim."

*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 797, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999).

> Nor does the law erect a strong presumption against the recipient's success under the ADA. Nonetheless, an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work. To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could "perform the essential functions" of her previous job, at least with "reasonable accommodation."

*Id.* at 797–98, 119 S.Ct. 1597. With regard to the sufficiency of the plaintiff's explanation, the Court instructed:

> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" or her job, with or without "reasonable accommodation."

*Id.* at 807, 119 S.Ct. 1597.

■■■ In determining the extent of any conflict, "the court must undertake a fact-specific analysis of whether the claims made in the SSDI application directly contradict the allegations made in the ADA context." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 333 (2d Cir.2000). In Felix's case, she submitted a signed application form that stated: "I became unable to work because of my disabling condition on November 26, 1995." This statement, in isolation, would appear to negate an essential element of Felix's ADA claim—that she could perform the essential functions of the position sought with reasonable accommodation. However, the statement must be viewed in the context in which it was made.

Felix stated in general terms that she could not work as a result of her disabling condition without offering particular facts as to that condition. In addition, Felix believed, albeit mistakenly, that she was entitled to "temporary". SSDI benefits because she was unable to work in the subways.[4] Accordingly, this is not a situation involving "directly conflicting statements about purely factual matters." *Cleveland*, 526 U.S. at 802, 119 S.Ct. 1597. *See also Parker*, 204 F.3d at 334 ("In contrast to the *Cleveland* plaintiff, the plaintiff in *Mitchell* had offered 'purely factual' statements that directly contradicted one another and could not be reconciled with any amount of explanation.") (citing *Mitchell v. Washingtonville Ctr. Sch. Dist.*, 190 F.3d 1, 7 (2d Cir.1999)). In addition, differences in the definition of disability under the two statutory regimes weigh against a finding of judicial estoppel. As explained in *Feldman v. American Mem'l Life Ins. Co.*, 196 F.3d 783 (7th Cir.1999):

> [s]ufficient divergence exists between the definitions of "disability" under the ADA and SSDI that, in some circumstances, an individual can claim truthfully both that she is unable "to engage in any substantial gainful activity" under SSDI but also a "qualified individual with a disability" under the ADA.

---

4. This belief is particularly credible given that Felix was awarded partial Workers' Compensation benefits for having what the Board considered a forty percent disability. *See* Pl. 56.1 ¶ 10(a) at 23.

*Id.* at 790. The difference in statutory purposes is due, in large part, to the relevance of reasonable accommodation.

> The ADA only protects the disabled who can work with or without reasonable accommodation while SSDI does not consider reasonable accommodation at all in defining disability. Thus, an individual might be able to work with reasonable accommodation and therefore be a "qualified individual" under the ADA, but be unable to work without reasonable accommodation and thus "totally disabled" under SSDI as well.

*Id. See also Cleveland,* 526 U.S. at 803, 119 S.Ct. 1597 ("[W]hen the SSA determines whether an individual is disabled for SSDI purposes, it does *not* take the possibility of 'reasonable accommodation' into account.") (emphasis in original).

The difference in statutory schemes, in itself, is not enough to survive summary judgment in light of *Cleveland. See Motley v. New Jersey State Police,* 196 F.3d 160, 166 (3d Cir.1999) (ADA plaintiff's decision to rely solely on the differences in the statutory schemes was fatal to his ADA claim), *cert. denied,* 529 U.S. 1087, 120 S.Ct. 1719, 146 L.Ed.2d 641 (2000). In Felix's case, there are other explanations that sufficiently explain her contradictory positions. *First,* there is sufficient evidence that the SSA intake officer may have misunderstood, or misadvised with regard to, Felix's initial statements concerning her disability. This happened in *E.E.O.C. v. Stowe–Pharr Mills, Inc.,* 216 F.3d 373 (4th Cir.2000), where the plaintiff-applicant informed the intake officer that she could work with an accommodation but, upon the officer's advice, her application stated otherwise. *See id.* at 376 (application stated: "I became unable to work because of my disabling condition."). The court excused this statement based on the intake officer's advice and the routine language used on the SSDI application. *See id.* at 379.

*Second,* in her request for reconsideration, Felix stated that her condition had worsened. In *Cleveland,* the ADA plaintiff claimed that her statements were accurate "in the time period in which they were made." *Cleveland,* 526 U.S. at 807, 119 S.Ct. 1597. The Court appears to have countenanced the argument that plaintiff's condition significantly changed during the relevant time periods by allowing the issue to go to a jury. *Id.* Here, Felix's period of disability while employed by the NYCTA ran, at most, from November 26, 1995 to November 26, 1996. Felix originally applied for SSDI benefits on February 2, 1997 and, upon being denied, requested reconsideration on July 29, 1997, approximately eight months after being discharged from the NYCTA. It is conceivable that Felix's condition continued to progressively deteriorate so that she was a "qualified individual" as of November 26, 1995 but became totally disabled thereafter. For these reasons, a jury should determine whether Felix's statement to the SSA claiming total disability should preclude the instant ADA claims. *Cf. Parker,* 204 F.3d at 334 (no preclusion where employer informed plaintiff that he was being terminated for not returning to work at the end of his disability leave—"a reasonable jury could find that Parker's statements to the SSA constituted an explanation for his termination rather than a description of his actual physical abilities").

## C. ADA—General Principles

The ADA prohibits covered employers from discriminating:

> against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or

discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The term "discriminate" is defined to include, among other things, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual who is an applicant or employee...." 42 U.S.C. § 12112(b)(5)(A). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds *or desires*." 42 U.S.C. § 12111(8) (emphasis added). A "disability" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2).

■ To establish a prima facie case of discriminatory discharge under the ADA, an employee must show: "(1) that [she] is an individual who has a disability within the meaning of the statute, (2) that an employer covered by the statute had notice of [her] disability, (3) that with reasonable accommodation, [she] could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations." *Stone v. City of Mount Vernon*, 118 F.3d 92, 96–97 (2d Cir.1997). The Second Circuit has "ruled that failure to make reasonable accommodation, when the employee has satisfied the first three elements of [her] claim, amounts to discharge 'because of' [her] disability." *Parker*, 204 F.3d at 332 (citing *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir.1998)).

### D. ADA Disability

In determining whether an individual has an ADA-qualifying disability, the Second Circuit uses the three-step approach taken by the Supreme Court in *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). *See Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 641 (2d Cir.1998). *First*, plaintiff must show that she suffers from a physical or mental impairment. *See id.* (citing *Bragdon*, 524 U.S. at 631, 118 S.Ct. 2196). *Second*, plaintiff must identify the activity claimed to be impaired and establish that it constitutes a "major life activity." *See id. Third*, the plaintiff must show that her impairment "substantially limits" the major life activity previously identified. *See id.* If a plaintiff fails to satisfy each of these three prongs, her discrimination claim must be dismissed. *See Monroe v. Cortland County, N.Y.*, 37 F.Supp.2d 546, 550 (N.D.N.Y.1999) (citing *Colwell*, 158 F.3d at 641).

### 1. Impairment

■ The Equal Employment Opportunity Commission ("EEOC") has promulgated regulations and issued interpretive guidelines implementing the ADA.[5] One such regulation defines "mental impairment" as "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). Determining whether a person has a disability under the ADA is an individualized inquiry that is impacted by a wide variety of factors. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d

---

**5.** The EEOC's interpretation of the ADA is accorded " 'great deference' " as it is the agency " 'charged with administering the statute.' " *Reeves v. Johnson Controls World*

*Servs., Inc.*, 140 F.3d 144, 150 n. 3 (2d Cir. 1998) (quoting *Francis v. City of Meriden*, 129 F.3d 281, 283 n. 1 (2d Cir.1997)).

450 (1999). Felix's stated impairment was post-traumatic stress disorder ("PTSD") which she suffered for approximately four years after the firebombing incident. *See* Pl. 56.1 ¶ 5 at 14–15. While this condition was not permanent, it was of sufficient duration to qualify as an ADA impairment. *See Aldrich v. Boeing Co.*, 146 F.3d 1265, 1270 (10th Cir.1998) ("The regulations and the EEOC's interpretive guidelines clearly state that an impairment need not be permanent in order to rise to the level of a disability.") (citing 29 C.F.R. § 1630.2(j)(2)(iii)). *See also Adams v. Citizens Advice Bureau*, 187 F.3d 315, 317 (2d Cir.1999) ("[W]e have no occasion to consider whether temporary injuries are per se unprotected under the ADA.").

### 2. Major Life Activity

■ In deciding whether a particular activity is a "major life activity," the focus is "whether that activity is a significant one within the contemplation of the ADA . . .". *Colwell*, 158 F.3d at 642. In general, "major life activities" include functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i).

Here, the major life activity impaired by Felix's PTSD was sleep. The Second Circuit has held that sleep is "undoubtedly a major life activity." *Colwell*, 158 F.3d at 643. *See also Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir.1999) ("Sleeping is a basic activity that the average person in the general population can perform with little or no difficulty, similar to the major life activities of walking, seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting, and reaching."); *Knorr v. Pepsico Food Servs., Inc.*, No. 97 Civ. 1819, 1999 WL 200685, at *8 n. 15 (N.D.N.Y. Apr. 8, 1999) (citing *Colwell*).

### 3. Substantial Limitation

The EEOC has defined "substantially limits" to mean:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). EEOC regulations also list the following considerations as relevant: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

■ Felix's sleep disturbance was profound and well documented. Most of the Progress Reports from the MAC describe Felix's sleep disturbance—the June 28, 1996 Report in particular notes that Felix was only sleeping 1 to 2 hours per night. This level of insomnia rises well above the sleeping difficulties experienced by the general population. Felix's situation is thus distinguishable from that of the plaintiff in *Parker* who merely took medication to aid a "tough night's sleep." *Colwell*, 158 F.3d at 644. Rather, Felix's condition was similar to that found in *Knorr* where the plaintiff was only able to sleep one to one and one-half hours per night. *See Knorr*, 1999 WL 200685, at *8. As in *Knorr*, Felix's chronic inability to sleep was a substantial limitation of a major life activity.

### E. Reasonable Accommodation

#### 1. General Principles

 Assuming, *arguendo*, that no causal connection between the disabling limitation and the requested accommodation is needed to invoke ADA protection, the reasonableness of the requested accommodation must be determined. "It is well established that under the ADA, the employer's duty reasonably to accommodate a disabled employee includes reassignment of the employee to a vacant position for which she is qualified." *Dalton v. Subaru–Isuzu Auto., Inc.,* 141 F.3d 667, 677 (7th Cir.1998) (citing 42 U.S.C. § 12111(9)(B)). *See also Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 99 (2d Cir.1999) ("[W]here a comparable position is vacant and the disabled employee is qualified for the position, an employer's refusal to reassign the employee to that position—absent some other offer of reasonable accommodation—constitutes a violation of the ADA."). Furthermore, "[t]he option of reassignment is particularly important when the employee is unable to perform the essential functions of his or her job...." *Dalton,* 141 F.3d at 677 (citing 29 C.F.R. § 1630.2(o)). *See also Norville,* 196 F.3d at 98 ("An individual is 'otherwise qualified' under the statute if she can, 'with or without reasonable accommodation, ... perform the essential functions of the employment position that such individual holds or desires.") (citing 42 U.S.C. § 12111(8)).

 While the ADA places a duty on employers to ascertain whether there are some jobs that the employee might be qualified for, *see Dalton,* 141 F.3d at 677 (internal quotation marks and citation omitted), this rule is not without limitation. First and foremost, an "employer is not obligated to provide an employee the accommodation [she] requests or prefers, the employer need only provide some reasonable accommodation." *Gile v. United Airlines, Inc.,* 95 F.3d 492, 499 (7th Cir.1996). "Nothing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers." *Dalton,* 141 F.3d at 678. In addition, employers are not required to create new jobs or reassign disabled employees if no positions are vacant. *See Norville,* 196 F.3d at 99. Nor are employers required to retrain and assign disabled employees to entirely different positions. *See, e.g., Mitchell,* 190 F.3d at 9; *Parisi v. The Coca–Cola Bottling Co. of New York,* 995 F.Supp. 298, 303 (S.D.N.Y.1998) (transfer required only when an equivalent similar position exists), *aff'd,* 1999 WL 66164, 172 F.3d 38 (2d Cir.1999) (unpublished).

According to the NYCTA, Felix could not have been transferred to an office duty Railroad Clerk position as she could not have fulfilled all of the position's essential functions given her inability to work in the subways. Whether an exception to this policy for Felix would have converted "a nondiscrimination statute into a mandatory preference statute," *Dalton,* 141 F.3d at 679, depends on what one considers the essential functions of an office duty Railroad Clerk to be.

#### 2. Essential Functions

 Although a qualified individual with a disability must be able to perform the essential functions of a position, " 'that inquiry is not limited to the employee's existing job. Rather, the plain language of the statute includes an employee who has the ability to do other jobs within the company that such disabled person "desires".' " *Connolly v. Bidermann Indus. U.S.A., Inc.,* 56 F.Supp.2d 360, 366 (S.D.N.Y.1999) (quoting *Smith v. Midland*

*Brake, Inc.*, 180 F.3d 1154, 1160–61 (10th Cir.1999)).

The term "essential functions" has been defined by the EEOC to mean the "fundamental" duties to be performed in the position in question, as opposed to functions that are merely "marginal." *See* 29 C.F.R. § 1630.2(n)(1). A function may be essential if there are a limited number of employees who can perform that function. *See* 29 C.F.R. § 1630.2(n)(2)(ii). Other factors that are relevant to this inquiry include: the employer's judgment as to which functions are essential; written job descriptions; the amount of time spent on the job performing the function; the consequence of not requiring the transferee to perform the function; and the work experience of past incumbents. *See* 29 C.F.R. § 1630.2(n)(3)(i)-(iv), (vi).

The Second Circuit analyzed the essential functions issue in *Stone*. There, the plaintiff, a firefighter who was rendered paraplegic after an off-duty accident, brought suit against the City of Mount Vernon for failing to assign him to a light-duty position. *See* 118 F.3d at 93. The Fire Department had two light duty bureaus: the Fire Alarm Bureau ("FAB") and the Fire Prevention Bureau ("FPB"). *See id.* The City refused to reassign Stone to either of these bureaus because it was the Fire Department policy that all active firefighters must be able to perform fire-suppression duties, regardless of the bureau to which they are assigned. *See id.* at 94. Stone argued that the Department could have accommodated him as fire suppression was not an essential function of an FAB or FPB position. *See id.*

The Second Circuit vacated the lower court's grant of summary judgment in defendants' favor, stating:

> proper analysis of a claim under the federal disability statutes must be focused on "the fundamental job duties *of*

the employment position the individual with a disability . . . desires,*" 29 C.F.R. § 1630.2(n)(1) (emphasis added), rather than solely on the title held by a person occupying that position or the other positions occupied by most persons holding that title. The court should have focused more closely on the job duties of firefighters assigned to FAB or FPB. *Id.* at 99. The court further noted that "as a matter of practice, firefighter assigned to FAB or FPB simply have not been called upon to fight fires." *Id.* at 99–100. Given this historical practice, the court found it "entirely permissible for a factfinder to infer that the ability to engage in fire-suppression activities is marginal to the positions in FAB and FPB." *Id.* at 100.

Here, as in *Stone*, the functions deemed essential by the NYCTA may not be. Given how infrequently office duty Railroad Clerks are actually required to work in the subways each year, and the number of subway duty Railroad Clerks who could fulfill this function, a jury could find that Felix could have been transferred to an office duty position without causing the NYCTA undue hardship.

### 3. Request for Accommodation

#### a. Office Duty Railroad Clerk

The ADA imposes liability on an employer for "not making reasonable accommodations to the *known* physical or mental limitations" of an employee. 42 U.S.C. § 12112(b)(5)(A) (emphasis added). Furthermore, the EEOC Interpretive Guidelines state that: "*In general,* . . . , it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." 29 C.F.R. pt. 1630 App. § 1630.9 (emphasis added). The general rule, therefore, is that the initial burden of requesting an accommodation is on the employee and it is only

after such a request has been made that the employer must engage in the "interactive process" of finding a suitable accommodation. *See Stola v. Joint Indus. Bd.,* 889 F.Supp. 133, 135 (S.D.N.Y.1995) (An "employer is obliged to accommodate only those disabilities that are obvious or called to its attention by the employee.").

Courts have applied this general rule and dismissed ADA claims where the plaintiff has failed to prove that she requested an accommodation. *See, e.g., Mazza v. Bratton,* 108 F.Supp.2d 167, 176 (E.D.N.Y.2000) ("A claim of disability discrimination arising from termination of an employee based on failure to accommodate is not made out under the ADA unless the employee's request for a reasonable accommodation has been denied by the employer."), *aff'd,* No. 00–9146, 2001 WL 363513 (2d Cir. Apr. 11, 2001) (unpublished); *Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 165 (5th Cir.1996) ("[I]t is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one."); *Gaston v. Bellingrath Gardens & Home, Inc.,* 167 F.3d 1361, 1363 (11th Cir.1999) ("[T]he duty to provide a reasonable accommodation is not triggered until a specific demand for an accommodation has been made.").

 Application of this general rule is not warranted, however, where the disability is obvious or otherwise known to the employer without notice from the employee. The notice requirement is rooted in common sense. Obviously, an employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability. *See Stola,* 889 F.Supp. at 135. Moreover, the notice requirement prevents an employee from keeping her disability a secret and suing later for failure to accommodate. *See Beck v. University of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1134 (7th Cir.1996) ("An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations—a duty dictated by common sense lest a disabled employee keep [her] disability a secret and sue later for failure to accommodate."). These concerns are not relevant when an employer has independent knowledge of an employee's disability. The rule requiring a request for accommodation can be ignored in such circumstances. *See Norris v. Allied–Sysco Food Serv.,* 948 F.Supp. 1418, 1436 (N.D.Cal.1996) ("[I]f an employee's disability and the need to accommodate it are obvious, an employee is not required to expressly request reasonable accommodation."), *aff'd,* 191 F.3d 1043 (9th Cir.1999), *cert. denied,* 528 U.S. 1182, 120 S.Ct. 1221, 145 L.Ed.2d 1121 (2000).[6]

Here, Felix did not request a clerical and/or computer position until August 13, 1996. Yet the vacancies identified by plaintiffs in the office duty Railroad Clerk positions all occurred in February and July of 1996. The question, then, is whether Felix's delay in making a specific request precludes plaintiffs from relying

---

**6.** Without an employee's formal request for accommodation, there may be a question as to the sufficiency of an employer's independent knowledge. *See, e.g., Fjellestad v. Pizza Hut of America, Inc.,* 188 F.3d 944, 952 (8th Cir.1999) (employer had adequate notice of employee's disability after employee was hospitalized for one month as a result of a car accident, notes from the employee's physicians contained various work restrictions, and employer knew that employee was diagnosed with a permanent impairment of her right arm). Here, notice is not an issue as the NYCTA was fully aware of Felix's condition and her inability to work in the subways from assessments prepared by its own medical personnel, *see infra.*

on vacancies that were available before the date of her request. Under the circumstances of this case, the answer is no.

 "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Jackan v. New York State Dep't of Labor,* 205 F.3d 562, 566 (2d Cir.2000). Moreover, the ADA regulations contemplate shifting the burden to the employer to initiate an interactive process with the employee. *See* 29 C.F.R. § 1630.2(*o*)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation."). To satisfy its ADA obligations in this regard, an

> employer must first identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites, and then determine whether the employee's own knowledge, skills, and abilities would enable her to perform the essential functions of those alternative positions, with or without reasonable accommodation.

*Dalton,* 141 F.3d at 678.

 Here, the NYCTA was put on notice that Felix could not work in a subways but could otherwise perform clerical work

as early as January 11, 1996 when Dr. Mitchell indicated these limitations in her Restricted Work Assessment form. If the NYCTA had taken the initiative in the interactive process, it would have discovered early on that Felix had a clerical background and was qualified for a Railroad Clerk office position. Instead, the NYCTA did not even consider Felix for such an office position.[7] The sole rationale for this failure is that the NYCTA's personnel policies require all Railroad Clerks to return to the subways on an emergency basis, whether they are designated as office workers or not. Whether this policy was reasonable is in dispute, *see supra.* Accordingly, there is a question as to whether the NYCTA engaged in the interactive process in good faith. *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 315 (3d Cir.1999) ("The interactive process, as its name implies, requires the employer to take some initiative."); *Bultemeyer v. Fort Wayne Cmty. Sch.,* 100 F.3d 1281, 1285 (7th Cir.1996) ("A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.").

### b. Clerical Associate 1A

The only other vacancy identified by plaintiffs, Clerical Associate 1A, became available August 23, 1996. But on August 15, 1996, Felix had been designated "No Work" status, which meant that the NYCTA could not assign her any work within the transit system.[8]

---

7. The failure on the part of the NYCTA is especially troublesome when one considers that not all of the Railroad Clerk office positions were even advertised.

8. Plaintiffs dispute the "No Work" determination made by Dr. Mitchell on a number of grounds. Plaintiffs argue that Dr. Mitchell was not qualified to make the contested determination because she was not a psychiatrist and had no specialized psychiatric training. *See* Pl. Mem. at 17. Plaintiffs also argue that

Dr. Mitchell's determination conflicted with that of Felix's treating physician, Dr. Schwartz, who expressed his opinion that Felix was capable of working up through the date of her termination. *See id.* at 17–18. Plaintiffs also point to Felix's August 13, 1996 letter which expressed her desire to work. *See id.* at 18. Finally, plaintiffs contest the "No Work" determination on the ground that the NYCTA never informed Felix how to challenge a contested medical determination. *See id.* at 18–19. For these reasons, plaintiffs

While the propriety of the NYCTA's "No Work" determination cannot be resolved on summary judgment, there is another reason why the Clerical Associate position was not a reasonable accommodation for Felix. At the relevant time, the NYCTA had a policy of not reclassifying operating titles, such as Railroad Clerk, into non-operating titles, such as Clerical Associates. *See* 1/19/00 Deposition of Albert Capon ("Capon Dep."), Director of Restricted Duty, Ex. 9 to Pl.App., at 153 ("Usually an operating employee because of the positions that they're in can only be reclassified into an operating title. They can't be reclassified pursuant to the Department of Personnel into a clerical position."). Whether this policy is rooted in DCAS rules prohibiting reclassifications from operating titles into non-operating titles or whether it is based on past difficulties experienced by the NYCTA in attempting such reclassifications is irrelevant. *Compare* Schultz Dep. at 127–28 (testifying that the DCAS would permit a Railroad Clerk to be transferred to a clerical position), *with* Capon Dep. at 153 ("All I know is we have tried it in the past to do that. I did it once and we were told we can't do that for some reason."). Nonetheless, it is undisputed that the NYCTA had a legitimate, nondiscriminatory policy prohibiting such transfers.

Felix's reclassification from Railroad Clerk to Clerical Associate would have violated this policy.[9] Such reclassification would have required an exception, or preference, not mandated by the ADA. *See Dalton*, 141 F.3d at 679 ("[W]e have been unable to find a single ADA or Rehabilitation Act case in which an employer has been required to reassign a disabled employee to a position when such transfer would violate a legitimate, nondiscriminatory policy of the employer, ..., and for good reason."); *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir.1995) (ADA does not mandate a policy of "affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled."). *Cf. E.E.O.C. v. Humiston–Keeling, Inc.*, 227 F.3d 1024, 1028 (7th Cir. 2000) ("A policy of giving the job to the best applicant is legitimate and nondiscriminatory."). Accordingly, the Clerical Associate position was not a reasonable accommodation for Felix whether or not she was determined to be on "No Work" status.

## F. Nexus

There is, however, another obstacle that dooms Felix's ADA claim to failure, namely that of nexus or causal connection. The NYCTA argues that Felix did not have an ADA disability because there was no connection between the major life activity impaired (sleep) and Felix's actual work limitations (no subway work). *See* Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment Dismissing the Complaint at 15 n. 8. Plaintiffs argue that the ADA does not require a causal connection between the major life activity impaired and the adverse employment action taken—here, failure to make reasonable accommodation. *See* Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pl.Mem.") at 15–17. As discussed above, Felix has offered sufficient proof to sustain a finding that she

---

argue that disputed issues of fact exist as to whether Felix was capable of working from August 15, 1996 through the date of her termination. *See id.* at 19.

**9.** The fact that the position was filled by an employee who came from a non-operating title, Office Aide III, further supports the NYCTA's compliance with this policy.

had an ADA disability due to her sleeping difficulties. However, because there was no nexus or causal connection between Felix's ADA-qualifying limitation and the reasonable accommodation sought, Felix cannot invoke the protections of the ADA.

Plaintiffs cite several cases, including *Bragdon*, in support of their position. For example, a court in the Northern District of New York has stated that, "no causal connection is required to be shown between a particular limitation and an employer's discriminatory response." [10] *Monroe*, 37 F.Supp.2d at 552.[11] The court cited *Colwell* in support of this proposition. This citation is perplexing, however, as the *Colwell* court never squarely addressed this issue.[12] *See Colwell*, 158 F.3d at 644, n. 1 ("We need not consider whether a plaintiff must show that the discrimination he suffered is motivated in any way by the limitation of the particular major life activity."). Thus, the nexus requirement remains an open issue in this Circuit, notwithstanding the Supreme Court's decision in *Bragdon*.[13]

Plaintiffs also attempt to rely on *Bragdon* for the proposition that the ADA proscribes discrimination based on the disability of the individual rather than on the substantially impaired major life activity. Plaintiffs' reliance is misplaced. In *Bragdon*, 524 U.S. at 628–29, 118 S.Ct. 2196 the plaintiff, an HIV-infected woman, sued her dentist under Title III of the ADA for refusing to fill a cavity in his office. The Supreme Court found that plaintiff's impairment, HIV, substantially limited the major life activity of reproduction. *See id.* at 641, 647, 118 S.Ct. 2196. The Court held that plaintiff's "HIV infection was a disability under the ADA" and that plaintiff was therefore entitled to ADA protection. *See id.* at 655, 118 S.Ct. 2196. The Court did not require a nexus between the alleged discrimination and the life activity impaired. The case was remanded so that the Court of Appeals could re-visit whether plaintiff's HIV infection posed a direct

---

**10.** This statement was dicta given that the plaintiff in *Monroe* failed to show that his physical impairment substantially limited any major life activity at the time of the alleged discrimination. *See* 37 F.Supp.2d at 556. In any event, *Monroe* is not binding on this Court. *See IBM Credit Corp. v. United Home for Aged Hebrews*, 848 F.Supp. 495, 497 (S.D.N.Y.1994) (district court decisions are not binding precedent for other district courts).

**11.** In *Monroe*, the plaintiff, who suffered from anal fissures, alleged that he was not substantially limited in his ability to work but rather in his ability to walk, stand and lift. *See* 37 F.Supp.2d at 550. Plaintiff's condition prevented him from operating a skidsteer for more than 40 minutes each day which, in turn, prevented him from occupying the position of Recycling Foreman. *See id.* at 555. The court found that plaintiff's impairments did not substantially limit the major life activities of walking and standing and proceeded to analyze their effect on plaintiff's ability to work. *See id.* at 554. The court held that

plaintiff was not substantially limited in his ability to work as the skidsteer restriction did not affect his ability to fulfill managerial responsibilities or the duties of other jobs. *See id.* at 555. Plaintiff's ADA claim was therefore dismissed.

**12.** In *Colwell*, three police officers brought suit under the ADA, claiming that they were unfairly denied promotions. *See* 158 F.3d at 638. The Second Circuit reversed a jury verdict in their favor, finding that the plaintiffs failed to show that their impairments (back injuries and a cerebral hemorrhage) substantially limited any major life activities (such as standing, sitting, lifting, bending, sleeping and walking). *See id.* at 645.

**13.** *Bragdon* was decided on June 25, 1998, while *Colwell* was decided October 15, 1998. Presumably, the Second Circuit is aware of applicable Supreme Court precedent when issuing its decisions. The fact that the Circuit did not view *Bragdon* as controlling is further support of its inapplicability to Title I cases, *see infra*.

threat to the health and safety of others such that refusing her treatment would come within the ADA's direct threat exception. *See id.* at 648, 655, 118 S.Ct. 2196 (citing 42 U.S.C. § 12182(b)(3)).

*Bragdon* is inapposite to employment-based ADA claims for a number of reasons. *First,* and foremost, is the fact that it is a Title III case. As such, the relevant question was whether the defendant discriminated against a disabled plaintiff by denying her the enjoyment of a place of public accommodation. *See* 42 U.S.C. § 12182(a). Thus, the Court's focus was on whether the plaintiff was statutorily disabled. The question of reasonable accommodation never arose. *Second,* the *Bragdon* decision involves HIV infection which, given its myriad of symptoms, is *sui generis.* This is apparent from the multitude of major life activities affected by HIV infection. *See* 524 U.S. at 637, 118 S.Ct. 2196 ("We have little doubt that had different parties brought the suit they would have maintained that an HIV infection imposes substantial limitations on other major life activities."). Thus, while the ability to reproduce is obviously affected, "HIV infection must be regarded as a physiological disorder with a constant and detrimental effect on the infected person's hemic and lymphatic systems from the moment of infection." *Id.* Given the panoply of symptoms, it was not a big leap for the Court to decide that HIV infection is an ADA disability for purposes of Title III.

Plaintiffs are asking this Court to extend *Bragdon* to the employment context and find that the limitation that defines an ADA disability does not necessarily need to be the subject of the requested accommodation. Here, Felix's impairment was PTSD which limited her ability to sleep and also prevented her from working in the subways, although it did not prevent her from working in general. The reason-

able accommodation sought, however, had nothing to do with Felix's sleep difficulties. Felix did not seek an accommodation for her sleep difficulties, such as permission to come in late or to take naps during the work day. Yet plaintiffs would have this Court extend ADA protection to Felix whose only limitation qualifying her for such protection, her sleep disorder, is not alleged to have impaired her ability to work. Such a result is counterintuitive and would contravene the ADA's statutory purpose. *See Rascon v. U.S. West Comm., Inc.,* 143 F.3d 1324, 1330 (10th Cir.1998) (ADA was enacted to eradicate discrimination against persons with disabilities and to ensure equality of treatment).

■ Plaintiffs do not contend that Felix was substantially impaired in her ability to work. Rather, plaintiffs recognize that Felix's inability to work in the subways only disqualified her from a narrow range of jobs and thus would not qualify as a substantial impairment. *See* 29 C.F.R. § 1630.2(j)(3)(i) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.") *See also Heilweil v. Mount Sinai Hospital,* 32 F.3d 718, 723 (2d Cir.1994) ("[A] person found unsuitable for a particular position has not thereby demonstrated an impairment substantially limiting such person's major life activity of working."). Plaintiffs fail to recognize that in deciding ADA employment cases, courts necessarily look at a plaintiff's general ability to work. *Cf. Keck v. New York State Office of Alcoholism and Substance Abuse Servs.,* 10 F.Supp.2d 194, 199 (N.D.N.Y.1998) (where a plaintiff provides evidence of a limitation only in the context of her job, the implication is that working is the major life activity affected).

Reference to the asthma cases is helpful. In *Castro v. Local 1199, Nat'l Health and Human Servs. Employees Union,* 964

F.Supp. 719 (S.D.N.Y.1997), the court held "that to qualify as a disability, the employee's impairment must limit her employment generally.'" *Id.* at 725 (quoting *Heilweil,* 32 F.3d at 719). There, the only restriction limiting plaintiff's employment was her need to avoid extreme temperatures. *See* 964 F.Supp. at 721. The only accommodation plaintiff sought was a place to warm up or cool down while working outside. *See id.* at 725. The court held that plaintiff was not disabled under the ADA because her physical impairment "only restricted plaintiff's work capabilities in the narrowest sense." *Id.* (limitations with regard to a single aspect of a single position generally do not rise to the level of an ADA disability) (citations omitted).

Similarly, in *Heilweil,* the plaintiff was unable to work in a single location—a hospital blood bank—because certain fumes within the blood bank exacerbated her asthma. *See* 32 F.3d at 720. The Second Circuit found that plaintiff's asthma did not substantially limit her major life activities of breathing or working. *See id.* at 723 ("An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one."). Accordingly, the court affirmed the dismissal of plaintiff's discrimination claim under the Rehabilitation Act of 1973.[14] *See id.* at 726.

Here, Felix's substantive limitation—the limitation that prompted the need for reasonable accommodation—was her inability to work in the subways. Felix's sleep problems, although significant, did not impair her ability to work. Nor did Felix ever request an accommodation for her sleep problems. Hence, this presents a peculiar situation—by definition, Felix was an individual with an ADA dis-

ability due to her insomnia. Yet the limitation that qualified her as a disabled person did not affect her ability to work. Felix's other limitation, her inability to work in the subways, did impair her ability to work but only in a very narrow sense. This limitation would therefore not qualify Felix as ADA disabled. *See* discussion *supra.* This failure to allege a causal connection, or nexus, between the qualifying limitation and the accommodation requested is fatal to Felix's ADA claim. *Cf.* 9 Lex K. Larson, *Employment Discrimination* § 154.03, at 154–13 (2d ed. 2001) ("The ADA requires reasonable accommodation of the limitations, not of the disability itself."). This conclusion comports with the purpose of the ADA which is to ensure equality of treatment, not create a preference for disabled persons. *See Terrell v. USAir,* 132 F.3d 621, 627 (11th Cir.1998) (sole intent of the ADA is to provide equal, not preferential, opportunities to disabled persons).

## III. CONCLUSION

In sum, although Felix may have been a disabled person for purposes of the ADA, she was not entitled to its protections as there was no nexus between the limitation that defined her disability and the reasonable accommodation sought. Accordingly, summary judgment is granted in defendant's favor and this case is dismissed. The Clerk of the Court is directed to close this case.

SO ORDERED:

---

**14.** Courts may rely on Rehabilitation Act cases when interpreting the ADA. *See Pritch-* *ard v. Southern Co. Servs.,* 92 F.3d 1130, 1132 n. 2 (11th Cir.1996).