**Gennedy GLOZMAN, Plaintiff**

v.

**RETAIL, WHOLESALE & CHAIN STORE FOOD EMPLOYEES UNION, LOCAL 338; Zabar's & Co., Inc.; Saul Zabar, Defendants.**

**No. 00 CIV. 9781(RLC).**

United States District Court,
S.D. New York.

April 23, 2002.

Law Offices of Karl J. Stoecker, New York City (Karl J. Stoecker, Of Counsel), for Plaintiff.

Friedman Wolf & Grisi, New York City (James R. Grisi, Abigail R. Levy, Of Counsel), for Defendant Retail, Wholesale & Chain Store Food Employees Union, Local 338.

Epstein Becker & Green, P.C., New York City (Peter M. Panken, Lauri F. Rasnick, Of Counsel), for Defendants Zabar's & Co., Inc. and Saul Zabar.

## OPINION

ROBERT L. CARTER, District Judge.

On July 22, 2001, plaintiff Gennedy Glozman filed an amended complaint against defendants Retail, Wholesale & Chain Store Food Employees Union, Local 338 ("Local 338" or the "Union"), Zabar's & Co., Inc. ("Zabar's"), and Saul Zabar ("Zabar"), president of Zabar's, alleging that, in connection with his termination as a Zabar's employee, defendants violated the Americans with Disabilities Act, 42 U.S.C.A. § 12101 *et seq.* ("ADA"); the New York State Human Rights Law, N.Y. Exec. L. § 296 and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–107 (collectively, "NYHRL"); and that Local 338 breached its duty of fair representation under the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"). (Am.Cplt.¶ 1.) Defendants now move for summary judgment pursuant to Rule 56, F.R. Civ. P. For the reasons set forth below, the court grants their motion in its entirety.

## BACKGROUND

The following facts are undisputed.[1] Plaintiff Gennedy Glozman was hired to work as a deli clerk in Zabar's in 1989. As a deli clerk, Glozman was responsible for slicing and weighing meats, cleaning, stocking, and serving customers. (Zabar Defs.' Rule 56.1 Stmt. ¶¶ 8–9.) Plaintiff remained in the deli department until October, 1996 when he was transferred to a position in housewares accepting deliveries of merchandise and loading it into elevators. (*Id.* at ¶¶ 17, 22.) Subsequently, Glozman was again transferred, this time to Zabar's bread department. (*Id.* at ¶ 26.) Plaintiff worked in the bread department until roughly the end of 1998, when he was, yet again transferred, this time to the sanitation department, where he had limited contact with customers and other employees. (*Id.* at ¶¶ 29, 30.) In sanitation, Glozman was responsible for collecting cardboard and other refuse from the store's departments and bringing it to

---

**1.** Defendants Zabar's and Saul Zabar, and Local 338 have each filed a statement pursuant to Local Civil Rule 56.1, cataloguing material facts as to which each contends there is no genuine issue. In response, plaintiff Glozman has, as required, filed his own Local Rule 56.1 Statement. Under Local Rule 56.1(c), all material facts, uncontroverted by plaintiff, will be deemed admitted. As to facts that plaintiff disputes, "the court must carefully analyze the evidence the opponent cites to determine whether it creates a genuine dispute of a material fact." *Queen of Hearts Cruises, Inc. v. United States*, No. 96 Civ. 6712, 98 Civ. 0111, 1999 WL 195298, at *3 (S.D.N.Y. Apr.7, 1999) (Patterson, J.).

the compactor room either on handcarts or by dragging. (*Id.* at ¶ 32.) Unsatisfied with this position, plaintiff made an unsuccessful attempt at the conclusion of 1998 to return to his previous job in the deli department. (*Id.* at ¶ 38.)

In early 1999, Glozman complained, for the first time, that some items were too heavy and requested assistance in carrying them. (*Id.* at ¶¶ 40, 41.) Zabar's asked Glozman to provide a doctor's note detailing his condition and any limitations on his ability to work. (*Id.* at ¶ 43.) On March 10, 1999, Glozman's doctor sent a letter to Zabar's listing plaintiff's limitations which Zabar's found satisfactory. (*Id.* at ¶ 47.)

On March 12, 1999, Glozman injured his back while lifting a bag of garbage and was taken to the emergency room at St. Luke's–Roosevelt Hospital. (*Id.* at ¶¶ 48, 49.) Glozman subsequently filed a worker's compensation claim asserting his inability to work. (*Id.* at ¶ 50.) Plaintiff remained on disability leave for close to one year.

On February 23, 2000, Glozman sought to return to work. (*Id.* at ¶ 56.) Glozman was informed that to do so he would need a doctor's note. (*Id.* at ¶ 59.) Several days later, Glozman provided an "Updated Narrative Report" (the "Narrative Report") that appeared to have been signed by his treating physician, Dr. Krementsov. (*Id.* at ¶ 60.) The Narrative Report was originally prepared for the worker's compensation proceedings and stated, in pertinent part, that plaintiff:

> still has not demonstrated full and completed (sic) recovery, and he is not fully able to perform many tasks at his previous capacity, as prior to the accident.

Patient reports presence of headaches aggravated by stress and emotional tension. He is easily fatiguable and often requires long periods of rest during the day. He still complains of pain in the lower back and always (sic) aggravated by cold, extreme movement and physical activity. He still can not lift, pull, push or carry heavy object (sic) as before the accident. Also, standing or sitting for long periods of time in one position is difficult without aggravating his condition. This to some degree interferes with his usual and customary activity of daily living.

(*Id.* at ¶ 67.)

On March 10, 2000, at a meeting with Saul Zabar, Glozman and his union representative were informed that the Narrative Report did not specify what jobs Glozman was capable of performing. (*Id.* at ¶ 88; Zabar Aff. ¶ 3.) Glozman promised to try to secure additional documentation from his doctor relating to what work he could do. (*Id.* at ¶ 89.) Glozman did not indicate that obtaining such a letter would pose a problem and, in fact, stated that he would visit his doctor on March 14, 2000.[2] (*Id.* at ¶¶ 90, 91.)

As of March 23, 2000, Zabar's had not received a new medical note from Glozman nor had Glozman contacted anyone at Zabar's to state that he could not obtain such a note. (*Id.* at ¶¶ 96, 97.) Plaintiff never produced any additional medical documentation specifying what jobs he could do and what accommodations he needed. (*Id.* at ¶ 99.) On March 31, 2000, a letter was sent to Glozman informing him that he had been terminated. It also stated that Gloz-

---

**2.** Zabar's and Saul Zabar's Rule 56.1 Statement makes reference to the dates of March 14, 2001 and March 11, 2001 as the dates on which plaintiff stated that he would visit his physician and did, in fact, visit his physician, respectively. *See* Zabar Defs.' Rule 56.1 Stmt. ¶¶ 91, 92. However, as the events at issue were thoroughly concluded by then, the court takes defendants' submission to be referring to the dates of March 14, 2000 and March 11, 2000, respectively. *See* Zabar Aff. Exh. F.; Panken Affirm. Exh. L.

man had been observed working at a pizza parlor while he was out on medical leave, and that such behavior may have constituted abandonment of his job at Zabar's. (*Id.* at ¶¶ 100, 101.)

Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") after his discharge and, on January 11, 2001, the EEOC issued a right-to-sue letter. (*Id.* at ¶ 127a.[3]) On June 25, 2000, plaintiff also filed a charge with the City of New York Commission on Human Rights against Zabar's and Saul Zabar alleging disability discrimination. (*Id.* at ¶ 126a.) Finally, on July 22, 2001, Glozman filed an amended complaint against, *inter alia*, Zabar's and Saul Zabar, alleging discrimination based on disability and retaliatory discharge. (*Id.* at ¶ 128.; Am. Cplt. ¶¶ 31–38, 65–68.)

With regard to Local 338, the following facts are undisputed. While at Zabar's, plaintiff was a member of Local 338 and was covered by a collective bargaining agreement between Zabar's and Local 338 which allowed employees to retain seniority for up to one year of absence due to injury. (Local 338 Def.'s Rule 56.1 Stmt. ¶¶ 3, 6, 25.) During his Zabar's tenure, plaintiff had contacted Local 338 on several occasions to complain about working conditions, hours, or compensation. (*Id.* at ¶ 13.)

In February, 2000, after nearly a year of disability leave, plaintiff contacted Sidney Blumgold, his union representative, to inform him that he was prepared to return to work. (*Id.* at ¶ 29.) Blumgold emphasized to plaintiff that, as a condition of his return, he had to present Zabar's with a letter from his doctor stating that he could resume his normal duties. (*Id.* at ¶ 31.) Glozman told Blumgold that he did not foresee any difficulty in getting the letter. (*Id.* at ¶¶ 32, 33.) Subsequently, Glozman contacted Blumgold to inform him that, despite giving Saul Zabar such a letter, Zabar refused to let him return to work. (*Id.* at ¶ 37.) Blumgold contacted Saul Zabar and scheduled a meeting for March 10, 2000 to discuss Glozman's return to work. (*Id.* at ¶ 38.)

On March 10, 2000, Blumgold met with Glozman and Zabar to discuss plaintiff's situation. (*Id.* at ¶ 43.) During the meeting, Zabar requested another, more detailed letter from Glozman's doctor. (*Id.* at ¶ 44.) Blumgold did not hear plaintiff make any request, at this time, for an accommodation to perform his job duties. (*Id.* at ¶ 47.) Right after the meeting, Blumgold met separately with Glozman and asked him repeatedly if he could obtain the additional medical documentation requested by Saul Zabar, to which Glozman replied that he could and assured Blumgold that he would contact him when he did. (*Id.* at ¶ 48.) After that conversation, however, Glozman never spoke with Blumgold again. (*Id.* at ¶ 49.)

After plaintiff's failure to produce the necessary letter and failure to timely contact the Union following his termination, the Union determined that any effort to arbitrate would be futile. (*Id.* at 61.) Approximately three months after his termination, Glozman's attorney sent a letter, dated June 28, 2000, requesting an arbitration hearing. (*Id.* at ¶ 62.) By letter, dated June 30, 2000, plaintiff also asked

**3.** Zabar defendants' Rule 56.1 Statement contains two errors here. First, paragraphs 126 and 127 are followed by two other paragraphs, also numbered 126 and 127. The court will refer to these latter paragraphs, respectively, as 126a and 127a. For the remainder of the paragraphs that follow, the court will preserve the current numbering as it now stands. Second, paragraph 127a refers to January 11, 2000 as the date the EEOC issued a right-to-sue letter but, for the reasons discussed earlier, *see, supra*, note 2, the court takes defendants to be referring to January 11, 2001.

the Union to file a grievance contesting his termination. (*Id.* at ¶ 63.) However, Local 338 did not respond to either request. (*Id.* at ¶ 64.)

Plaintiff filed an unfair labor practice charge against Local 338 with the National Labor Relations Board ("NLRB") on June 30, 2000. (*Id.* at ¶ 65.) In an October 24, 2000 decision, the NLRB refused to issue a complaint against the Union. (*Id.*) Plaintiff appealed the decision and, in a January 31, 2001 letter, the NLRB denied the appeal. (*Id.*) The EEOC's right-to-sue letter is directed to Zabar's only since plaintiff did not file any claim against Local 338 with the EEOC or any state or local agency. (*Id.* at ¶ 67.)

## DISCUSSION

A court may grant summary judgment only if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Rule 56(c), F.R. Civ. P. To the moving party falls the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the court must construe the facts in the light most favorable to the nonmoving party, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and all reasonable inferences and ambiguities must be resolved against the moving party. *Flanigan v. Gen. Elec. Co.,* 242 F.3d 78, 83 (2d Cir. 2001). Nor will the typically fact-intensive nature of discrimination cases preclude a grant of summary judgment. *Abdu–Brisson v. Delta Air Lines,* 239 F.3d 456, 466 (2d Cir.2001), *cert. denied* — U.S. —, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001); *see also Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### (1) Plaintiff's Discriminatory Discharge Claim Against Zabar's

Under the ADA, an employer is prohibited from discriminating "against a qualified individual with a disability because of [his] disability . . . ." 42 U.S.C. § 12112(a). An ADA plaintiff carries the initial burden of establishing a prima facie case of discrimination. *See Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 383 (2d Cir.1996). To establish such a prima facie case, an employee must show that: 1) his employer is subject to the ADA; 2) he suffers from a disability within the meaning of the ADA; 3) he was capable of performing the essential functions of his job with or without reasonable accommodation; and 4) he was terminated because of his disability. *See Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998); *Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001).

For the purpose of its summary judgment motion, Zabar's does not dispute that it is an employer subject to the ADA. (Zabar Defs.' Mem. of Law in Supp. of Summ. Judg. at 12.) However, Zabar's does hotly contest each of the remaining elements necessary for a prima facie case, starting with Glozman's claim that he suffers from a disability within the meaning of the ADA. (*Id.* at 13–16.)

### (a) Disability Within Meaning of the ADA

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102(2). Glozman does not claim to have had a record of impairment. (Pl.'s Mem. of Law in Opp'n to Zabar Defs.' Mot. for Summ. Judg. at 3–7.) As a result, to prove he has a disability under

the ADA, Glozman must show: 1) that his back injury substantially limited one or more of his major life activities; or 2) that Zabar's regarded his back injury as a substantially-limiting impairment.

### (i) Major Life Activity

■ Although the ADA does not define "major life activities" or "substantially limits," the regulations issued by the EEOC, which are accorded "great deference" by courts, see *Francis v. City of Meriden,* 129 F.3d 281, 283 n. 1 (2d Cir.1997), are instructive. The EEOC regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The EEOC regulations define "substantially limits" as:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Further, the EEOC regulations state that the following factors should be considered in determining whether an impairment substantially limits a major life activity:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2). Thus "an impairment may affect an individual's life without becoming disabling." *Hazeldine v. Bever-*age Media, Ltd.*, 954 F.Supp. 697, 703 (S.D.N.Y.1997) (Haight, J.); *see also Ryan,* 135 F.3d at 870.

Zabar's contends that, based on Glozman's own testimony, his physical impairment does not limit, much less substantially, any of his major life activities. (Zabar Defs.' Mem. of Law in Supp. of Summ. Judg. at 13.) Glozman suffers from a lumbrosacral spinal injury in the form of herniated and bulging discs in his lower back. (Stoecker Affirm. Exh. F; Am. Cplt. ¶ 5.) As a result of his injury, according to Glozman's doctor, prolonged sitting, bending, and lifting in excess of ten pounds is contraindicated. (Goldshine Aff. Exh. O.) Viewing the evidence in the light most favorable to plaintiff, it does not appear that Glozman's particular injury substantially limits him in one or more major life activities.

First, the inability to lift in excess of ten pounds or to sit for extended periods of time, as compared to the abilities of the average person in the population, are not substantial limitations on major life activities within the meaning of the ADA. The inability to lift heavy objects does not constitute a disability under the ADA. *See, e.g., Strassberg v. Hilton Hotels Corp.,* No. 95 Civ. 6235, 1997 WL 531314, at *2 (S.D.N.Y. Aug.28, 1997) (Stanton, J.) ("Courts have found that the inability to lift even less weight [than thirty pounds] is not a disability"), *aff'd,* 173 F.3d 846, 1999 WL 220143 (2d Cir.1999); *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 644–45 (2d Cir.1998) (plaintiff who could lift " 'light objects', but not 'very heavy objects' " failed to demonstrate a substantial limitation on a major life activity); *Varre v. City of Syracuse,* No. 96–CV–1792, 2000 WL 270966, at *5 (N.D.N.Y. Mar.6, 2000) (inability to lift in excess of ten pounds did not substantially limit a major life activity); *Zarzycki v. United*

*Technologies Corp.*, 30 F.Supp.2d 283, 289 (D.Conn.1998) (same). Similarly, the inability to sit or stand for an extended duration does not amount to a substantial limitation on a major life activity. *See Colwell,* 158 F.3d at 644; *Wernick v. Federal Reserve Bank of New York,* No. 93 Civ. 2606, 1995 WL 598973, at *1, 3 (S.D.N.Y. Oct.10, 1995) (Duffy, J.), *aff'd,* 91 F.3d 379 (2d Cir.1996).

Second, Glozman's back injury does not substantially limit him in the major life activity of working as he is still able to perform a wide range of jobs. "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *see also Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 17 F.Supp.2d 271, 274 (S.D.N.Y. 1998) (Carter, J.). As such, for a person to be substantially limited with respect to the major life activity of working, he must show that he is "precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton,* 527 U.S. at 492, 119 S.Ct. 2139.

Glozman, accordingly, is not substantially limited within the meaning of the ADA because his back injury forecloses him from a narrow range of jobs. While Glozman may no longer be able to perform his job in Zabar's sanitation department, *see* Panken Affirm. Exh. D at 398, he admits that he "can work in deli, in bread department [where he] used to work" without accommodation. (Panken Affirm. Exh. D at 417.) Furthermore, Glozman has testified that he is capable of driving a cab and watching elderly people. (*Id.* at 401, 409.) Finally, Glozman was employed part-time at a pizza parlor during the time he was out on disability. (Zabar Defs.' Rule 56.1 Stmt. ¶ 101.) Since the record shows that Glozman is capable of performing a variety of jobs, he is not substantially limited in the major life activity of working.

### (ii) Regarded as Disabled

Glozman argues that Zabar's terminated him because they regarded him as disabled. (Pl.'s Mem. of Law in Opp'n to Zabar Defs.' Mot. for Summ. Judg. at 3–7.) To state a claim under the "regarded as" prong of the ADA, the plaintiff must "allege that the employer believed, however erroneously, that the plaintiff suffered from an 'impairment' that, if it truly existed, would be covered under the statute[ ] and that the employer discriminated against the plaintiff on that basis." *Francis v. City of Meriden,* 129 F.3d 281, 285 (2d Cir.1997). Analysis under the "regarded as" prong of the ADA "turns on the employer's perception of the employee, a question of intent, not whether the employee has a disability." *Id.* at 284. However, there is no evidence that Zabar's regarded Glozman as disabled within the meaning of the ADA.

To begin with, Zabar's was initially skeptical of Glozman's back injury, informing its insurance carrier that it "suspect[ed] fraud" and wanted his case "watched closely," *see* Stoecker Affirm. Exh. E. (Pl.'s Mem. of Law in Opp'n to Local 338 Def.'s Mot. for Summ. Judg. at 8.) In addition, surveillance conducted by Zabar's insurance carrier established that Glozman was working at a pizza parlor while he was out on disability. (Zabar Aff. Exh. F.; Stoecker Affirm. Exh. E.) This alone suggests that Zabar's would hesitate to accept Glozman's injuries at face value, much less perceive them as substantially limiting him in one or more major life activities. Finally, Saul Zabar's statement that Glozman "couldn't do any of the jobs that we have at Zabar's", *see* Grisi Decl. Exh. D at 234, on which Glozman relies, is

not conclusive. The following exchange took place during Saul Zabar's deposition:

Q. If Mr. Glozman presented himself as ready to work at any job at Zabar's, why didn't you hire him back?

A. Because he presented a—he presented a doctor's report that said he couldn't push, he couldn't walk, he couldn't talk, he couldn't move, he couldn't do any of the jobs that we have at Zabar's.

(Grisi Decl. Exh. D at 234.) Placed in context, it is obvious that Saul Zabar's response is made in reference to the Narrative Report and, as such, is more in the way of a commentary on the restrictions specified in the Narrative Report, in essence, stating that, assuming the truth of these restrictions, there is no job that Glozman is capable of performing at Zabar's. This is not an independent appraisal of Glozman's abilities as justification for the refusal to return him to his job. In sum, the facts here do not support the conclusion that Zabar's perceived Glozman as being substantially limited in a major life activity.

*(b) Otherwise Qualified to Perform Position's Essential Functions*

Even if plaintiff could demonstrate that he suffers from a disability within the meaning of the ADA, he would be unable to satisfy another necessary element of a prima facie case, "that he is qualified, that is, with or without reasonable accommodation, he is able to perform the essential functions of the job." *Christopher v. Laidlaw Transit, Inc.*, 899 F.Supp. 1224, 1226 (S.D.N.Y.1995) (Parker, J.). A "qualified individual" must be able to perform the essential functions of the position "that such individual holds or desires." 42 U.S.C.A. § 12111(8). Discrimination refers to "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless [it is]

demonstrate[d] that the accommodation would impose an undue hardship on the operation of the business ...." 42 U.S.C.A. § 12112(b)(5)(A). "Reasonable accommodation" may include "reassignment to a vacant position." 42 U.S.C.A. § 12111(9).

■ Zabar's argues that, based on the Narrative Report submitted by Glozman, it appeared that he was not "otherwise qualified" to perform any of the jobs at Zabar's and, even if he were, he failed to specify a reasonable accommodation for his stated limitations. (Zabar Defs.' Mem. of Law in Supp. of Summ. Judg. at 17.) Since Glozman never specifically requested a reasonable accommodation, *see* Panken Affirm. Exh. D at 423, 426–27, Zabar's contends that any failure to provide one on its part cannot be actionable. (Zabar Defs.' Mem. of Law in Supp. of Summ. Judg. at 17.)

■ In this contention, Zabar's is mistaken. While it is generally true that an employee's failure to expressly request a reasonable accommodation relieves an employer of liability for not providing one, *see, e.g., Stola v. Joint Industry Bd.*, 889 F.Supp. 133, 135 (S.D.N.Y.1995) (Kaplan, J.), "[a]pplication of this general rule is not warranted ... where the disability is obvious or otherwise known to the employer without notice from the employee." *Felix v. New York City Transit Auth.*, 154 F.Supp.2d 640, 657 (S.D.N.Y.2001) (Scheindlin, J.). "The rule requiring a request for accommodation can be ignored in such circumstances." *Id.* Zabar's knew of Glozman's injury as of the March 10th meeting. Furthermore, by requesting a transfer from his position in sanitation, whose duties he could no longer perform, to a position in the sales department, *see* Panken Affirm. Exh. D at 423, plaintiff effectively requested an accommodation, provided that a vacancy existed in sales and that he was qualified for the position. *See Jackan v. New York State Dep't of*

*Labor,* 205 F.3d 562, 566 (2d Cir.2000) (individuals who cannot perform the duties of their current positions can request transfer to a vacant position whose duties they can perform as a reasonable accommodation), *cert. denied,* 531 U.S. 931, 121 S.Ct. 314, 148 L.Ed.2d 251 (2000); *Stone v. City of Mount Vernon,* 118 F.3d 92 (2d Cir.1997).

■ Ultimately, however, whether Glozman's failure to expressly request an accommodation released Zabar's from liability makes little difference, as it is clear that Glozman could not perform the essential functions of the sales position to which he requested transfer, nor could he establish that a vacancy existed for that or a similar position.

### (i) Essential Functions

Glozman has not shown that he was capable of performing the essential functions of the position of deli clerk when he requested a transfer to that position at the March 10th meeting. While Glozman had held the position of deli clerk approximately four years earlier, he had been removed from it for one reason or another and transferred to the housewares department. Moreover, his request to be returned to the position of deli clerk at the end of 1998 had been denied. (Zabar Defs.' Rule 56.1 Stmt. ¶¶ 38, 39.) Glozman disputes the reasons alleged by Zabar's for his transfer from the deli department and for Zabar's subsequent refusal to transfer him back in 1998. Zabar's contends that Glozman was transferred from sales positions in the deli and bread departments because of customer complaints. (Zabar Defs.' Mem. of Law in Supp. of Summ. Judg. at 19.) Glozman contends that Zabar's did not receive any such customer complaints and that his transfers were in retaliation for his request for a raise and his efforts to enforce the union contract. (Pl.'s Rule 56.1 Stmt. ¶¶ 4, 5, 8, 11, 12.)

In a motion for summary judgment, however, "the non-moving party may not 'rest upon ... mere allegations or denials' of the adverse party's pleading." *Felix v. New York City Transit Authority,* 154 F.Supp.2d 640, 650 (quoting *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000)). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar College,* 196 F.3d 435, 452 (2d Cir.1999). The only support offered by Glozman for the claimed fabrication is that Zabar's would not have transferred him to the bread department, where he was assured of similar customer contact, if indeed he previously had had problems fighting with customers in the deli department. (Pl.'s Mem. of Law in Opp'n to Zabar Defs.' Mot. for Summ. Judg. at 15.) This is little more than speculation as Glozman adduces no evidence, beyond his largely self-serving affidavit, that the complaints lodged against him were fabricated. A party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986).

Zabar's, by contrast, has provided affidavits, negative performance evaluations, and a long history of well-documented customer complaints, which suggest that Glozman was a difficult employee. *See* Goldshine Aff. ¶¶ 9, 11, 12–14, Exhs. B–L; Zabar Aff. ¶¶ 5–7. Moreover, a letter written by Local 338 on November 19, 1996, to Saul Zabar specifically references Glozman's problems with customers and fellow employees and that Zabar's intention in reassigning Glozman from the deli department to housewares was "to limit Mr. Glozman's interaction with customers." (Zabar Aff. Exh. D.)

The ability to interact well with customers is an essential function of a sales posi-

tion and was definitely an integral function of Glozman's position in the deli department in 1996. (Panken Affirm. Exh. D at 13–14; Goldshine Aff. ¶ 8.) Reasonable accommodation "does not mean elimination of any of the job's essential functions." *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir.1991). Zabar's evidence shows that Glozman could not perform the essential functions of deli clerk or of any sales clerk position at Zabar's.

*(ii) Vacancy*

In addition, Glozman has failed to show that a vacancy in the deli department existed at the time he sought the reasonable accommodation. While an employer has a duty to make reasonable accommodation, the "plaintiff bears the burden of establishing that a vacancy existed into which he or she might have been transferred." *Jackan*, 205 F.3d at 566 (2d Cir.2000), *cert. denied*, 531 U.S. 931, 121 S.Ct. 314, 148 L.Ed.2d 251 (2000). Glozman's only evidence to meet this requirement are his assertions, "upon information and belief," that numerous individuals were hired to work in the deli department while he was out on disability leave and that one such hire was made in February, 2000, about the time Glozman sought to return to work. (Glozman Aff. ¶ 48.) Plaintiff also asserts, "upon information and belief," that many individuals were hired in the bread department, described by him as having heavy turnover, subsequent to February, 2000. (*Id.* at ¶ 49.)

Zabar's has produced employment records for each of the hires cited by Glozman, the most recent of which occurred in the deli department on January 17, 2000, one month before plaintiff sought to return to work. (Zabar Rep. Aff. ¶¶ 2–3, Exh. A.) Plaintiff has, therefore, failed to show that a vacancy existed in the deli or bread

departments in March, 2000. Zabar's hirings in the deli department during plaintiff's disability leave or in January, 2000 are irrelevant to whether a vacancy existed when plaintiff sought to return to work in March, 2000.

*(2) Plaintiff's Failure to Show Pretext*

Assuming, *arguendo*, that plaintiff could establish a prima facie case of discrimination, his claims would still fail because Glozman has not shown that Zabar's reasons for terminating him were pretextual. Claims of intentional discrimination under the ADA are analyzed within the larger framework of the burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and refined in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.1998) (employing *McDonnell Douglas* framework in context of ADA claim). Under this burden-shifting analysis, the plaintiff employee must first establish a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Once established, the employer defendant must come forth with a legitimate, nondiscriminatory reason for its decision. *See Hicks*, 509 U.S. at 506–07, 113 S.Ct. 2742. The employee must then show that the employer's proffered reason is pretextual and that plaintiff's alleged disability was the real factor motivating the employer's decision. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Hicks*, 509 U.S. at 507–08, 113 S.Ct. 2742.

■ Zabar's has offered a nondiscriminatory reason for terminating Glozman, namely, that he did not deliver additional medical documentation, as promised, after the March 10th meeting.[4] *See, e.g., Par-*

4. Glozman contends that Zabar's asked him

to produce a "100% healed" letter, not a fit-

*ker v. Columbia Pictures Indus.*, 204 F.3d 326, 343 (2d Cir.2000) (Winter, C.J., dissenting) ("[A]n employer may lawfully require an employee who misses work because of an incapacity ... to provide medical clearance before returning .... I see nothing in the ADA that prevents an employer from imposing such a requirement and from terminating an employee who does not provide such written clearance ....").

For example, Glozman has not shown that Zabar's had reason to believe that it would be impossible for him to obtain additional medical documentation when it requested him to do so or that Zabar's had no intention of consulting or honoring such documentation.[5] While Glozman, relying, in part, on a letter written by Zabar's attorney, Eugene Eisner, to the Union, *see* Stoecker Affirm. Exh. J., argues that the March 10th meeting was a sham, deliberately scheduled by Zabar's for the last business day before plaintiff's one-year seniority under the collective bargaining agreement lapsed in order to prevent him from addressing any objections to his return, Pl.'s Mem. of Law in Opp'n to Zabar Defs.' Mot. for Summ. Judg. at 13–14.,

Glozman's argument does not establish that Zabar's proffered reason for terminating him was pretextual. Had Zabar's terminated Glozman the day after the March 10th meeting, then it surely would have been guilty of acting in bad faith. It would have been guilty of engineering the situation to foreclose Glozman from any hope of returning to his job and would have asked Glozman to produce another doctor's letter that it had no intention of consulting or honoring. But Zabar's did not do this. It terminated plaintiff on March 31, 2000, three weeks after the March 10th meeting, first and foremost, for failure to produce the additional medical documentation that he had said was forthcoming. For whatever reason Zabar's initially scheduled the meeting when it did, Zabar's ultimately did not discharge Glozman the day after the March 10th meeting. Under these circumstances, Glozman's meeting with Zabar's and the Union, on March 10, 2000, was not prejudicial to Glozman or obstructive to his efforts to return to work. As such, Zabar's request for additional medical documentation does not constitute bad faith and Gloz-

---

to-work letter, a request which, he argues, is a *per se* violation of the ADA. (Pl.'s Mem. of Law in Opp'n to Zabar Defs.' Mot. for Summ. Judg. at 12.) Glozman offers no evidence that Zabar's demanded a letter that he could work without restriction. To the contrary, Glozman was employed at Zabar's with medical restrictions of which Zabar's was aware, arising from a back injury he sustained in February 1999, approximately one month before further aggravating his condition and going on disability. (Glozman Aff. ¶¶ 20–21.) Furthermore, Glozman himself makes reference to Zabar's request for additional medical documentation in a letter to Local 338 dated June 30, 2000 in which he writes: "Mr. Zabar told me that I needed to bring a letter from a doctor saying I was fit to work." (Glozman Aff. Exh. D.) Accordingly, Glozman has failed to raise a genuine issue as to any material fact on this point.

**5.** Instead, Glozman argues that this is a mixed-motive case in which he need only show that discriminatory animus was one factor, but not necessarily the only one, behind his termination. (Pl.'s Mem. of Law in Opp'n to Zabar Defs.' Mot. for Summ. Judg. at 17–18.) However, even in a mixed-motive case where legitimate motives are present alongside illegitimate ones, the plaintiff has to "focus his proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.1992). As plaintiff has not done this, nor alluded to evidence of pretext, summary judgment in Zabar's favor on this issue is appropriate.

man has not carried his burden of establishing pretext.

### (3) Plaintiff's Retaliation Claim Against Zabar's and Saul Zabar

■ Plaintiff claims that Zabar's and Saul Zabar terminated him in retaliation for his request for an accommodation, thereby violating § 503 of the ADA.[6] (Pl.'s Mem. of Law in Opp'n to Zabar Defs.' Mot. for Summ. Judg. at 18–19.) To state a prima facie case of retaliation under the ADA, plaintiff must show that: 1) he was engaged in protected activity; 2) the employer had notice of that activity; 3) he suffered an adverse employment action; and 4) there existed a causal connection between the protected activity and the adverse employment action taken. *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999).

■ Viewing the facts in a light most favorable to plaintiff, there is no evidence to suggest that there was a causal link between Glozman's request for accommodation and his termination. Glozman himself has provided at least one competing theory as to why he was terminated. He suggests that he may have been terminated for asking for a "balloon" payment or raise in 1996. (Panken Affirm. Exh. D at

337.) Since Glozman has not adduced evidence sufficient to establish the necessary element of causality, his retaliation claim must be dismissed. *See Sarno*, 183 F.3d at 160.

### (4) Plaintiff's NYHRL Claims Against Zabar's

Once all ADA claims have been dismissed against Zabar's and Saul Zabar, no federal claims remain with respect to these defendants and the court has discretion, pursuant to 28 U.S.C. § 1367(c)(3), to decline to invoke supplemental jurisdiction over any remaining state claims against them.[7] Accordingly, the court dismisses plaintiff's NYHRL claims against Zabar's and Saul Zabar without prejudice. *See, e.g., Ryan v. Grae & Rybicki*, No. 96 CV. 3731, 1996 WL 680256, at *7 (E.D.N.Y. Nov.13, 1996), *aff'd*, 135 F.3d 867 (2d Cir. 1998).

### (5) Plaintiff's Claim that Local 338 Breached the Duty of Fair Representation Under the LMRA

Plaintiff alleges that Local 338 breached its duty of fair representation under § 301 of the LMRA, *as amended*, 29 U.S.C. § 185, by arbitrarily, discriminatorily, and

---

**6.** Glozman's claims against Saul Zabar, in his individual capacity, alleging retaliation in violation of § 503 of the ADA, *see* Am. Cplt. ¶¶ 65–68, must be dismissed. In *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), a Title VII case, the Second Circuit held that an employer's agent, even one with supervisory control, may not be held individually liable under the ADA. Based on *Tomka*, district courts in the Second Circuit, while acknowledging that the Second Circuit has not directly ruled on the issue, have held that an employee cannot be held liable under the ADA. *See, e.g., Harrison v. Indosuez*, 6 F.Supp.2d 224, 229 (S.D.N.Y.1998) (Leisure, J.); *Sacay v. Research Foundation of City Univ. of New*

York, 44 F.Supp.2d 496, 503 (E.D.N.Y.1999). Unlike Title VII and the ADA, the NYHRL do impose individual liability for discrimination committed by "individuals who have an ownership interest in the defendant company or have power over personnel decisions." *Id.* However, Glozman has not brought claims against Saul Zabar in his individual capacity under the NYHRL. *See* Am. Cplt. ¶¶ 39–52.

**7.** It should be noted that plaintiff's inability to establish a disability within the meaning of the ADA does not foreclose him from establishing a disability under the NYHRL as the definition of disability under the NYHRL is broader than that under the ADA. *See Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 154 (2d Cir.1998).

in bad faith declining to process his grievance in connection with his termination at Zabar's. (Am.Cplt.¶ 29.) Viewing the facts in a light most favorable to Glozman, it appears that no jury could reasonably find for him on this issue.

### (a) Plaintiff's LMRA Claim Is Time–Barred

Plaintiff's claim that Local 338 breached its duty of fair representation under the LMRA is time-barred. A plaintiff has six months from the time his § 301 claim accrues to bring an action. *See DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 169–72, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). A claim for breach of the duty of fair representation accrues when the plaintiff knew or reasonably should have known that such a breach had taken place. *Cohen v. Flushing Hosp. and Med. Ctr.*, 68 F.3d 64, 67 (2d Cir.1995).

■ Glozman filed this action against Local 338 on December 27, 2000. Accordingly, the action would be time-barred if he knew or reasonably should have known before June 27, 2000 that such a breach had occurred. Glozman was terminated on March 31, 2000.[8]

Glozman asserts that he attempted to contact Sidney Blumgold, his union representative, between five to ten times in the three months following his termination, leaving a message on Blumgold's answering machine each time, and that not one of these phone calls was returned. (Local 338 Def.'s Rule 56.1 Stmt. ¶ 58.) Assuming the truth of these assertions, in the exercise of reasonable diligence, plaintiff should have discovered before June 27, 2000 that Local 338 was not going to pursue a grievance on his behalf.

Glozman has testified that he believed that Local 338 should have contacted him following his termination. (*Id.* at ¶ 60.) However, an employee must be diligent, at least to the extent of determining the Union's position on his termination. *See, e.g., Cohen*, 68 F.3d at 69. Glozman waited until June 28, 2000 to make a request for arbitration. (Local 338 Def.'s Rule 56.1 Stmt. ¶ 62.) Accordingly, for three months, he did nothing, with the exception of making the aforementioned telephone calls to Blumgold. (Grisi Decl. Exh. C at 174–75.) At numerous other times and with regard to issues of lesser importance, plaintiff had contacted the Union to complain or solicit its help. (Local 338 Def.'s Rule 56.1 Stmt. ¶¶ 13–21.) Plaintiff's course of conduct, as a result, suggests a lack of diligence on his part. Plaintiff's "own lack of diligence should not toll the limitations period in [his] favor." *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 128 F.3d 110, 115 (2d Cir.1997); *see also Cohen*, 68 F.3d at 68.

Alternatively, plaintiff and/or the Union did not initiate the grievance procedure outlined in the collective bargaining agreement. The applicable section of the collective bargaining agreement states:

> A grievance by an employee against an Employer concerning disciplinary action, must be filed by the employee within

---

8. March 31, 2000, the date on which Zabar's notified Glozman by letter of his termination, and not March 10, 2000 as Local 338 argues, *see* Local 338 Def.'s Mem. of Law in Supp. of Mot. for Summ. Judg. at 9–10, is the first date on which plaintiff could have realized that Local 338 would not pursue a grievance on his behalf. No employment action had been taken by Zabar's prior to March 31, 2000 and, hence, there was no employment decision that Glozman could have expected the Union to appeal before then, much less events that would have convinced him that the Union was not prepared to assist him. Even if Glozman knew he could not obtain the fit-to-work letter immediately after the March 10th meeting, it is entirely possible that plaintiff persisted in the belief that the Union might help him even in the absence of the letter.

fifteen (15) days after written notice by the Employer to the employee and to the Union of such discipline, otherwise the grievance shall be deemed to be waived. Any grievance other than for disciplinary action, must be filed in writing by the employee or the Union to the Employer within nine (9) months of the first grievable action, otherwise the grievance shall be deemed to be waived. Employee underpayment claims and Employer overpayment claims may not exceed nine (9) months.

(Grisi Decl. Exh. E, Art. 25(e).) Local 338 contends that "disciplinary action," as used in Article 25(e) of the collective bargaining agreement, encompasses any employee termination; accordingly, Glozman and/or the Union had 15 days to grieve his termination, not 9 months as Glozman alleges. (Local 338 Def.'s Mem. of Law in Supp. of Mot. for Summ. Judg. at 12–13.) When Glozman and/or the Union failed to do so, Local 338 argues that Glozman should have known that the Union had no intention of filing a grievance on his behalf. (*Id.*) It is well-settled that a union's failure to invoke the formal grievance procedure established in a collective bargaining agreement should put the employee on notice that the union does not intend to pursue his case further. *See, e.g., Cohen,* 68 F.3d at 69.

There is sufficient evidence to conclude that Glozman's termination was disciplinary in nature. Glozman's termination letter states that he was terminated for: 1) failing to produce a fit-to-work letter despite assuring Zabar's that he would, caus-ing him to lose his seniority; and 2) because he "may very well have abandoned [his] job at Zabar's by working elsewhere while on medical leave from Zabar's." (Grisi Decl. Exh. H.)

This suggests that Glozman's discharge was disciplinary in nature, punishment for violating the terms of his leave by working elsewhere while on disability and for failing to comply with assurances he made to Zabar's. Glozman was not discharged due to downsizing or some restructuring effort. He clearly bore some responsibility for his termination as it was triggered by short-comings on his part.

For these reasons, the court views his termination as disciplinary in nature, and his failure to file a grievance within the allotted 15–day period, as a waiver of his grievance. As such, the six-month statute of limitations began to run from April 15, 2000, and expired on October 15, 2000, time-barring plaintiff's LMRA claims against the Union.

### (6) *Plaintiff's Claim That Local 338 Violated the ADA*

Local 338 argues that the court does not have jurisdiction to hear plaintiff's ADA claims against the Union because Glozman has failed to exhaust proceedings before an agency such as the EEOC.[9] (Local 338 Def.'s Mem. of Law in Supp. of Mot. for Summ. Judg. at 25.) "It is well established that a plaintiff must file a charge of discrimination with the EEOC and obtain a right to sue letter from the EEOC before proceeding in federal dis-

---

9. Local 338 has raised a jurisdictional challenge on a motion for summary judgment pursuant to Rule 56, F.R. Civ. P. A challenge to jurisdiction is made pursuant to Rule 12(b)(1), F.R. Civ. P. Notwithstanding this fact, the court will treat Local 338's summary judgment motion as a "suggestion" of lack of subject matter jurisdiction. *See* 5A Wright & Miller, Federal Practice and Procedure § 1350, p. 209 (2d ed.1990); *see also Kantor v. Comet Press Books Corp.,* 187 F.Supp. 321, 322 (S.D.N.Y.1960) (Metzner, J.); *Brennan v. G.S.A. Ltd.,* No. 97 Civ. 6950, 1999 WL 92547, at *3 (S.D.N.Y. Feb.18, 1999) (Chin, J.) (treating motion for summary judgment alleging jurisdictional defects as motion made pursuant to Rule 12(b)(1), F.R. Civ. P.).

trict court [with a Title VII or ADA claim]." *Garcia v. Coca–Cola Bottling Co. of New York,* No. 96 Civ. 6072, 1998 WL 151032, at *2 (S.D.N.Y. Mar.31, 1998) (Schwartz, J.); *see also* 42 U.S.C. § 12117(a) (incorporating into the ADA, by reference, Title VII's enforcement scheme, codified at 42 U.S.C. § 2000e–5(e)(1), requiring exhaustion of all administrative remedies). A further requisite to filing suit under the ADA "is that the plaintiff name the defendant in a charge filed with the EEOC." *Mann v. Sunshine Biscuit,* No. 97 Civ. 8562, 1998 WL 352534, at *1 (S.D.N.Y. Apr.23, 1998) (Knapp, J.); *see also* 42 U.S.C. § 2000e–5(f)(1); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 617, 619–20 (2d Cir.1999), *remanded to* No. 96CV363FBSMG, 2001 WL 901140 (E.D.N.Y. Jul.31, 2001) (Block, J.).

In view of these principles, it is clear that plaintiff is barred from making a claim against Local 338 under the ADA. Glozman never filed a charge against Local 338 with either the EEOC or any state or local agency vested with equal authority. (Local 338 Def.'s Rule 56.1 Stmt. ¶¶ 66, 67.) Accordingly, because plaintiff did not exhaust his administrative remedies with respect to the Union, his claims against the Union under the ADA must be dismissed.

### (7) Plaintiff's NYHRL Claims Against Local 338

As the court has dismissed plaintiff's claims against the Union under the LMRA and the ADA, no federal claims remain against the Union. The court, therefore, exercises its discretion to decline to invoke pendent jurisdiction over Glozman's NYHRL claims against the Union.

### CONCLUSION

For the foregoing reasons, Zabar's and Saul Zabar are granted summary judgment, dismissing plaintiff's ADA claims against them with prejudice and his NYHRL claims without prejudice. Local 338 is granted summary judgment, dismissing plaintiff's LMRA and ADA claims against it with prejudice and his NYHRL claims without prejudice.

**IT IS SO ORDERED.**